# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JOHNNY LARA,**

                **Plaintiff,**

**-vs-**                           **Case No.  6:10-cv-1574-Orl-28KRS**

**RAYTHEON CORPORATION, also
known as RTSC and RAYTHEON
COMPANY,**

                **Defendant.**

_____/

# ORDER

Plaintiff, Johnny Lara ("Plaintiff"), appearing *pro se*, brings the instant action against his former employer, Raytheon Technical Services Company, LLC ("Raytheon"),[1] alleging religious discrimination[2] under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  The case is before the Court on the Motion for Final Summary Judgment (Doc. 53) filed by Raytheon, Plaintiff's Amended Response (Doc. 62), and Raytheon's Reply (Doc. 65).  As discussed below, Raytheon's motion must be granted.

## I.  Background

Plaintiff was employed by Raytheon during most of 2009.  He was hired as a Senior Information System Technologist II to work in Hohenfels, Germany under a government

---

[1]As explained later in the text of this Order, the Defendant named by Plaintiff—"Raytheon Corporation"—is not a legal entity, and the correct Defendant is substituted herein.

[2]In his summary judgment response, Plaintiff refers to "race discrimination" rather than religious discrimination.  (See Doc. 62 at 1).  Because there is no other reference to race discrimination in the record, the Court assumes that this statement was made in error.

defense contract.  The offer of employment dated November 20, 2008 specified that the offer was contingent on Plaintiff meeting the "Minimum Conditions for Hire" that were attached thereto.  (See Ex. 7 to Pl. Dep.).  Among those conditions was "meeting the Company's security standards as imposed by the U.S. Government, including the issuance . . . by the U.S. Government of any necessary security clearance within a reasonable time after [Plaintiff] begin[s] work."  (Minimum Conditions for Hire, part of Ex. 7 to Pl. Dep.).[3]  Plaintiff was aware that one of the conditions of getting hired was obtaining the appropriate government security clearance.  (Pl. Dep. at 49).

Plaintiff accepted Raytheon's offer of employment on December 4, 2008, (see Ex. 7 to Pl. Dep), and in February 2009 he began working for Raytheon in Germany.  At that time, he had not yet received his security clearance.  Plaintiff's immediate supervisor was Francis Sanchez, the Department Manager, and Sanchez in turn reported to Harry "Skip" Mohr, the European Regional Manager.

Plaintiff claims in this lawsuit that immediately after Plaintiff began his employment, Sanchez began harassing him about his Christianity.  For example, Plaintiff asserts that on his first day at work, February 11, Sanchez asked him if he was a Christian and then told another employee that Plaintiff was a Christian like that employee.  Plaintiff also recounts other incidents, including the showing of the movie *Religulous* in the workplace on February

---

[3]Additionally, a Memorandum of Understanding attached to the offer of employment explained:  "It is also required for you to receive within a reasonable period of time and maintain for the duration of this program and/or your assignment the required level of security clearance.  A **Secret** clearance is required for this position under the Contract." (Memorandum of Understanding, part of Ex. 7 to Pl. Dep.) (emphasis in original).

19.  On February 20, Plaintiff told Sanchez that he was offended about the showing of the movie and other religion-related incidents.

On March 3, Plaintiff informed Sanchez and Mohr that the U.S. Government had declined his interim security clearance.  (See Ex. 25 to Pl. Dep.).  On March 6, Bill Helmrath, the Deputy European Program Manager, informed Mohr—who was on a business trip to the United States at the time—that Plaintiff had told him about the viewing of a movie that made fun of religion and that Plaintiff had complained to Sanchez that such activity was contrary to Raytheon's policies.  (Mohr Decl. ¶¶ 4,8).

On March 20, 2009, two days after arriving back in Germany, Mohr met with Plaintiff and Sanchez.  (Id. ¶ 9; see also Ex. 10 to Pl. Dep.).  During that meeting, Plaintiff explained his concerns about religious issues in the workplace to Mohr.  (Pl. Dep. at 80-81; Mohr Decl. ¶ 9).  Mohr then told Sanchez not to talk about religion or to allow religious discussions any more, and Mohr told Plaintiff that he would check with Plaintiff from week to week to see if there were any continuing issues.  (Pl. Dep. at 80-81; Mohr Decl. ¶ 9).  The issue of Plaintiff's security clearance was also discussed at that meeting, and Mohr informed Plaintiff that Mohr would allow an additional ninety days for Plaintiff to obtain his security clearance, during which time Plaintiff would remain employed by Raytheon.  (Pl. Dep. at 80-81; Mohr Decl. ¶ 4).

On March 25, Mohr issued Sanchez a Letter of Counseling in which he recounted Plaintiff's assertions about the religious incidents and then stated: "Mr. Sanchez, these types of discussions, displays and/or arguments of religion are not appropriate in the work environment and must be terminated.  I direct you to meet with your team to ensure incidents

of this nature do not reoccur."  (Ex. A to Mohr Decl.).  That same day, Sanchez called a meeting and announced that there would be no more religious discussions or making of comments offensive to others.  (See EEOC Charge, Ex. 8 to Pl. Dep.).

Three days later, on March 28, 2009, without prior notice to Raytheon, Plaintiff left Germany and went to the United States.  The next day, he advised Mohr and other Raytheon personnel via email that he had "left Germany due to stress" and was at home in Texas.  (Ex. 11 to Pl. Dep.; see also Mohr Decl. ¶ 9 ("Eight days [after the March 20 meeting] [Plaintiff] walked off the job without one call or email indicating his problem.")).  Plaintiff stated in that email that he was "no longer able to work" "[d]ue to stress [he had] been through over the last 6 weeks while working under Francis Sanchez." (Ex. 11 to Pl. Dep.).  Plaintiff explained that he had filed a claim for Short Term Disability Benefits and would not be returning to work until released by his doctor.  (Id.).  Raytheon placed Plaintiff on a medical leave of absence.  (See Ex. 20 to Pl. Dep.).

On April 22, 2009, Plaintiff filed a charge of discrimination with the EEOC alleging religious discrimination.  (Ex. 8 to Pl. Dep.).  In that charge, Plaintiff identified the "date(s) discrimination took place" as February 7, 2009 through March 27, 2009, and listed several workplace incidents.  (Id.).  In May 2009, while Plaintiff was still in Texas, his security clearance was granted and he was advised of that fact via email by Raytheon's Human Resources Manager, Sharon Jones.  (See Ex. 20 to Pl. Dep.).  In that email, Jones requested that Plaintiff provide an anticipated date of return to work in Germany.  (Id.).

On June 25, 2009, Plaintiff was released by his doctor to return to work, and Plaintiff resumed work for Raytheon in Germany on July 1, 2009.  (Pl. Dep. at 107; Mohr Decl. ¶ 5).

He was assigned to the same job classification, pay, and benefits as before he had gone on leave, but he no longer reported to Sanchez and he had different duties.  (Pl. Dep. at 107, 115-17).  As explained by Mohr in his Declaration, due to Raytheon's obligations to its customer, the U.S. Army, the two open positions for Senior System Technologist II were filled by others while Plaintiff was out on medical leave.  (Mohr Decl. ¶ 5).

On October 20, 2009, Plaintiff sent an email to his supervisor, Charlie Givens, and Mohr thanking Givens for his professionalism since Plaintiff's return to Germany and stating that Plaintiff enjoyed his new opportunity at Raytheon.  (Ex. 24 to Pl. Dep.).  However, in that email Plaintiff also complained that one of his co-workers, Daniel Henry, had "constantly harassed" him since mid-July.  (Id.).  Plaintiff stated that Henry cursed at him and also talked to others "within two feet" of Plaintiff "about how Christianity was stupid."  (Id.).  Less than six hours after Plaintiff sent that email, Givens responded, stating that he would speak with Henry and make clear which topics were acceptable for work conversation.  (Id.).

The same day—October 20—that Plaintiff sent the email complaining about Henry, Plaintiff was offered a job by another company, SRA, in Stuttgart, Germany; that job paid $10,000 more than what Plaintiff was earning at Raytheon.  (Pl. Dep. at 129; Ex. 18 to Pl. Dep.).  Plaintiff accepted SRA's offer "right away," (Pl. Dep. at 165), signing his acceptance of SRA's offer on October 21, 2009, (see Ex. A to Doc. 65).

Nearly a month later, on November 17, 2009, Plaintiff emailed Givens a "letter of resignation effective November 27, 2009."  (Ex. 22 to Pl. Dep.).  Plaintiff began working for SRA on November 29, 2009.  (Pl. Dep. at 164-67).  Plaintiff was issued a right-to-sue letter by the EEOC on January 26, 2010, (Attach. to Doc. 1), and he filed this lawsuit on April 26,

2010, (Doc. 1).

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'  Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

-6-

III.  Discussion

A.  Correction of Name of Defendant

Plaintiff filed this suit against "Raytheon Corporation," (see Doc. 1), and in his Amended Complaint referred to Defendant as "Raytheon Corporation also known as RTSC and Raytheon Company," (see Doc. 8).   Defense counsel points out, however, that "Raytheon Corporation" is not a legal entity and that the correct name of Defendant is Raytheon Technical Services Company, LLC.  (See Doc. 47 at 1 n.1; Doc. 53 at 1 n.1). Accordingly, Raytheon Technical Services Company, LLC shall be substituted as the Defendant herein.

B.  Exhaustion of Administrative Remedies

Before turning to the merits of Raytheon's motion, the scope of Plaintiff's claims must be addressed.  As earlier noted, Plaintiff did file a charge with the EEOC, but in this lawsuit he attempts to assert claims that were not included in that charge.  Raytheon asserts that any claims based on events that occurred after March 27, 2009—the last date of discrimination identified by Plaintiff in that charge—are not properly before the Court. Raytheon is correct on this point.

"Prior to filing a Title VII action . . . a plaintiff first must file a charge of discrimination with the EEOC" and thereby exhaust his administrative remedies.  Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004).  "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.'"  Id. (alteration in original) (quoting Evans v. U.S. Pipe &

Foundry Co., 696 F.2d 925, 929 (11th Cir. 1983)).

"Although [courts] liberally construe EEOC charges that are prepared without the assistance of counsel, 'a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 F. App'x 844, 846 (11th Cir. 2006) (quoting Gregory, 355 F.3d at 1280). "[J]udicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." Gregory, 355 F.3d at 1279-80 (quoting Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989)).

Plaintiff acknowledges that "[t]he EEOC investigated Plaintiff's charge concerning only the alleged events up to March 27, 2009, before Plaintiff left Germany." (Doc. 62 at 11).[4] The reason for this is obvious—the only charge that Plaintiff ever filed with the EEOC listed the dates that discrimination occurred as February 7, 2009 to March 27, 2009. The EEOC was not on notice of any alleged discriminatory conduct occurring after that date, and thus it had no reason to investigate any later events. This is particularly so under the

_____

[4]Plaintiff also gives various, contradictory reasons for not filing an additional EEOC charge, including that he " he felt the system had failed him when he filed the initial EEOC complaint," (Doc. 62 at 12), that "the investigation was complete and the Plaintiff was not aware that he could file an amended complaint for the discrimination complaints and retaliations that took place after March 27, 2009," (id. at 11), and that "[o]nce the EEOC gave the Plaintiff the right to sue, the Plaintiff was not aware that he could open the EEOC complaint and amended [sic] the other incidents that took place after March 27, 2009," (id.). However, none of these explanations excuses the failure to file a charge regarding the later, separate conduct that Plaintiff has included in his claims in this lawsuit. Moreover, with regard to the last of the reasons listed above, the EEOC issued the right-to-sue letter to Plaintiff on January 26, 2010—after Plaintiff had left Raytheon and several months after the events he attempts to now include.

circumstances of this case, in which Plaintiff was on medical leave for several months and then resumed employment under a different supervisor than the one about whom he complained in his EEOC charge.  Thus, only claims based on the events occurring before Plaintiff left Germany in March 2009 are properly before the Court, and only those claims are considered herein.[5]

C.  The Merits of Plaintiff's Claims

1.  Hostile Work Environment

Plaintiff contends that his supervisor, Sanchez, harassed him based on his religion. However, Raytheon correctly argues that the events described by Plaintiff fail as a matter of law to amount to an actionable hostile work environment.

To establish a hostile environment claim based on religion under Title VII, a plaintiff must show (1) that he was a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on his religion; (4) that the

_____

[5]Even if the Court considered the later events, any claims based on those events are also without merit.  Plaintiff asserts that after he left Germany in March 2009 his short-term disability benefit claim was denied by the insurance carrier, and he asserts that this was in retaliation for the filing of his April 2009 EEOC charge.  He also asserts that when he went back to Germany in July 2009, he was placed in a different job than the one he was supposed to have; again, he alleges that this was retaliatory.  However, Raytheon has explained that Plaintiff's job had to be filled by someone else while he was in the United States receiving medical treatment, and Plaintiff acknowledges that neither his title nor his pay was changed—only the tasks that he was assigned.  Assertions of religious harassment by a fellow employee from July to October 1999 also have not been shown by Plaintiff to rise to the requisite level of severity to be actionable, and in any event Raytheon took action to stop that harassment when Plaintiff complained.  Finally, Plaintiff's constructive discharge claim similarly fails because such claims must meet even a higher standard than an actionable hostile work environment.  Plaintiff's deposition testimony that he willingly left Raytheon for a higher-paying position at another company also is fatal is to his constructive discharge claim.  (See, e.g., Pl. Dep. at 129).

harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment and create a discriminatorily abusive working environment; and (5) a basis for employer liability.  Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000), abrogation on other grounds recognized by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008); see also Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1344-45 (11th Cir. 2000).[6] Plaintiff satisfies the first element because he belongs to a protected religious group. Additionally, there is evidence that Sanchez subjected Plaintiff to some unwelcome harassment based on Plaintiff's religion; thus, the second and third elements are met here. However, Plaintiff's claim fails on the fourth element.

"Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component."  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).  "Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive."  Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000).  Even crediting Plaintiff's assertions that he perceived the harassment as severe and pervasive, from an objective standpoint the events described by Plaintiff do not rise to the level of severity necessary for

_____

[6]Although Gupta and Succar involved allegations of sexual harassment rather than religious harassment, the same standards employed in sex-based hostile environment claims apply to religion-based hostile environment claims.  See, e.g., Glaser v. Levitt, No. 98 C 210, 1998 WL 684207, at *5 (N.D. Ill. Sept. 23, 1998).

an actionable hostile work environment claim.

The determination of whether an environment is objectively hostile "can be determined only by looking at all the circumstances." Harris, 510 U.S. at 23.   The circumstances to consider "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. It is well-settled that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)).  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." Id.

The events upon which Plaintiff bases his hostile work environment claim are set forth in his April 22, 2009 EEOC charge.  In that charge, he listed the following incidents:  (1) on February 11, Plaintiff's first day at work, Sanchez asked Plaintiff if he was a Christian and when Plaintiff responded affirmatively Sanchez told another employee, Jim Kuehn, "Hey Jim, this guy is a Christian like you," which Plaintiff perceived as "making fun of my Christianity and beliefs"; (2) also on February 11, Sanchez told a Security Officer that if Plaintiff went into a secure area, Sanchez would "fire his ass"; (3) on February 12, Sanchez asked Plaintiff if it was "ok if we make fun and joke about your God Jesus Christ?"  Plaintiff at first said no but then said he changed his mind, whereupon Sanchez and another employee "continued to joke about Jesus Christ while [Plaintiff] stood 3 feet away from them," which Plaintiff found very offensive; (4) on February 19,  Sanchez brought in the movie *Religulous* on DVD and

the employees watched it, and that same day, "[i]n a discussion about religion during lunch, . . . the topic of the end of time was presented and [Plaintiff] just happened to say[] that nobody knows when that time will come."  Plaintiff said "there will be signs, and what they say about signs is that they say that the bar coding system contain [sic] the number 666 on clothes and food"; (5) on February 20, Sanchez made a remark about faith and "believing something that is not reality," continued to talk about the bar coding system and 666, and used a whiteboard to try to explain the bar coding system to Plaintiff, and other employees researched the bar coding system on the Internet to prove Plaintiff wrong; (6) on March 23, three days after the meeting with Mohr in which Plaintiff voiced his concerns, Sanchez treated Plaintiff "like a ghost" and would not acknowledge his presence; (7) on March 25, Sanchez called a meeting and announced that from then on, there would be no more religious discussions or comments to offend others, looking at Plaintiff the whole time he spoke; and (8) on March 26-27, Sanchez told Plaintiff to help with the moving of the laboratory by moving heavy furniture, and "the two Christians moved the lab" while Sanchez "and the other agnostic team member did not help as much."

These incidents identified by Plaintiff[7] do not rise to the level of being so extreme that they altered the terms or conditions of his employment.  The comments were sporadic and

_____

[7]At his deposition, Plaintiff was asked if there were any other incidents upon which his claim was based beyond those listed in his EEOC charge.  Plaintiff was unable to describe any additional incidents. (See Pl. Dep. at 68-70).  Although he asserted that he did not have his notes with him, the time for Plaintiff to present evidence of his claims was during discovery.  Moreover, in response to Raytheon's summary judgment motion Plaintiff has not identified any other incidents either.   His vague, eleventh-hour assertions of ongoing harassment through March 20, 2009, (see Doc. 62 at 9-10), are unavailing.

infrequent.  Plaintiff has identified only a handful incidents occurring during the first few

weeks of his employment, and some of these lack any religious overtones at all.  Although

it is clear that Plaintiff regarded Sanchez as disrespectful to Plaintiff and others, "Title VII is

not a 'general civility code.'"  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809

(11th Cir. 2010) (quoting Faragher, 524 U.S. at 788).  Many of Plaintiff's complaints about

Sanchez are regarding general rudeness or offensiveness rather than religion-based

hostility.[8]  See id. ("'Title VII does not prohibit profanity alone, however profane.  It does not

prohibit harassment alone, however severe and pervasive.  Instead, Title VII prohibits

discrimination, including harassment that discriminates based on a protected category . . .

.'" (quoting Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir.

2007))).

Other incidents occurred during discussions about religion in which Plaintiff willingly

participated.  (See, e.g., Pl. Dep. at 65).  Moreover, the incidents Plaintiff describes were not

physically threatening or humiliating; instead, they were "mere offensive utterances."  While

the showing of a controversial religious-themed movie was certainly improper, even when

viewed collectively the events recounted by Plaintiff do not support a finding of objective

severity.  Furthermore, Plaintiff informed Sanchez on February 20 that he was offended by

the movie and the other conduct, and Plaintiff has not identified any further religious

_____

[8]The same is true of Plaintiff's complaints about Daniel Henry later in 2009.  He described Henry "cursing at him" and telling him he was "in the way and using up space," and Plaintiff himself noted, "I realize I work in a military environment where people curse a lot."  (Ex. 24 to Pl. Dep.).  As discussed earlier, Plaintiff's complaints about Henry are not properly before the Court, but even if they were Henry's conduct also has not been shown to be actionable.

incidents after that date.

Similar conduct has been held to be insufficient to amount to a religiously hostile environment. See, e.g., Alansari v. Tropic Star Seafood Inc., 388 F. App'x 902, 905 (11th Cir. 2010) (affirming summary judgment on claim of religiously hostile work environment brought by Muslim, noting that behavior "including solicitations to go to church because 'Jesus would save' [plaintiff], other comments about his Muslim religion, and the playing of Christian music on the radio . . . may have been unwanted and even derogatory . . . but it did not rise to a threatening or humiliating level"); Richardson v. Dougherty County, Ga., 185 F. App'x 785, 791 (11th Cir. 2006) (noting that being referred to by supervisor as "preacher man" more than fifty times, as well as other comments regarding religion by others, did not amount to more than mere offensive utterances); Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977 (W.D.N.Y. 1996) (granting summary judgment for defendant where Israeli-born Jewish employee was asked "whether people from the Mideast beat their wives," "How come you cannot accept Jesus Christ as the messiah, the son of God?  After all, he was a Jew," and "Who did you have to kill" to make matzah cake, and was told that he could have Yom Kippur off "even though there is no such holiday"; court found that comments were "occasional" and "brief" and showed a personality clash rather than discriminatory intent); Kaplan v. Banque Nationale de Paris, NO. 94 CIV. 3965 (LLS), 1995 WL 753900 (S.D.N.Y. Dec. 19, 1995) (granting summary judgment on hostile environment claim where supervisor had asked Jewish plaintiff why he needed vacation time "for the Hebe holidays," told plaintiff he did not need Christmas off because he was Jewish, and told plaintiff not to "be so Jewish about it" when plaintiff corrected supervisor's profit and loss statement).  In sum, Raytheon

-14-

is entitled to summary judgment on Plaintiff's hostile work environment claim.

     2.  Retaliation

     Plaintiff did not check the box marked "retaliation" in his April 2009 EEOC charge, but he did allege some retaliatory actions in that charge, and the EEOC construed the charge as alleging both harassment and retaliation, (see EEOC Letter, Attach. to Doc. 1).  Thus, the Court will consider Plaintiff's pre-April 2009 retaliation allegations.

     Plaintiff alleges that after Mohr told Sanchez on March 20, 2009 not to talk about religion any more, three days later Sanchez "treated [Plaintiff] like he was [a] ghost by not acknowledging his presence" and Plaintiff "felt [that Sanchez] was mad and angry for [Plaintiff] exposing his bigotry on Christians." (Am. Compl. ¶ 12.h.).  Plaintiff also alleges that when Sanchez called a meeting on March 25 and announced that there would be no more religious discussions, Sanchez was looking at him the whole time, and Plaintiff "did not feel comfortable at all during that meeting."  (Id. ¶ 12.i.).  Plaintiff further alleges that when the lab was being moved on March 26 and 27, Sanchez told Plaintiff to help the team; Sanchez did not participate but had Plaintiff moving heavy furniture and equipment, and Plaintiff felt like he was being punished.  (Id. ¶ 12.j.).  Finally, Plaintiff suggests that at the March 20 meeting Mohr told him that he was going to replace his position if he did not get his security clearance in 90 days and that "in a way they were asking [Plaintiff] to leave because he had" complained to Mohr about Sanchez's religious harassment.  (Id. ¶ 12.g.).

     To make a prima facie showing of retaliation under Title VII, a plaintiff must establish: (1) that he engaged in activity protected by Title VII; (2) that he was subjected to a materially adverse action by his employer; and (3) a causal connection between the protected activity

and the adverse action.  <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955, 978 n.52 (11th Cir. 2008).  Plaintiff cannot establish a prima facie case of retaliation because even assuming *arguendo* that he can satisfy the first and third elements, none of the alleged retaliatory acts that he has described rises to the level of a "materially adverse action."

The Supreme Court has explained that "[t]he antiretaliation provision [of Title VII] protects an individual not from all retaliation but from retaliation that produces an injury or harm."  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67 (2006).  Thus, only "materially adverse" retaliatory actions are actionable.  <u>Id.</u> at 68.  This standard requires that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" in order to be actionable.  <u>Id.</u> (internal quotation and citation omitted).

Applying this objective standard, none of the actions identified by Plaintiff—being ignored on one occasion; being looked at by Sanchez while Sanchez informed employees that future religious discussion and insult would not be allowed; being asked by his supervisor to move furniture during a move of the laboratory; or being told that his position would be replaced if he did not get his security clearance within ninety days—rises to the level of being "materially adverse."  Only the last of these even warrants any discussion, and it too plainly does not amount to a "materially adverse" action.

Plaintiff's argument that being told of potential position replacement if his security clearance did not come through amounts to retaliation is rejected.  Plaintiff knew when Raytheon offered him the job that a Secret security clearance was required, and the employment offer documents that he has acknowledged receiving plainly state that he would

need to obtain that clearance "within a reasonable time" after he began work.  Plaintiff was never "asked to leave" in any event; he decided to return to Texas, his security clearance came through in May while he was gone, and he returned to Germany in July.  In sum, to the extent Plaintiff is attempting to assert a retaliation claim based on events occurring in March 2009, his claim fails.

IV.  Conclusion

In accordance with the foregoing it is **ORDERED** and **ADJUDGED** as follows:

1.   Raytheon Technical Services Company, LLC is hereby substituted as the Defendant herein in the place of "Raytheon Corporation."   The Clerk shall make this substitution on the docket.

2.   The Motion for Final Summary Judgment (Doc. 53) filed by Defendant is **GRANTED** as to all of Plaintiff's claims.

3.   Any other pending motions, including Defendant's Opposed Motion to Continue Trial Date (Doc. 73), are **DENIED as moot**.

4.   The Clerk is directed to enter judgment in favor of Defendant, Raytheon Technical Services Company, LLC in accordance with this Order and thereafter to close this file.

**DONE** and **ORDERED** in Orlando, Florida this 7th day of September, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party